EDWARD H. R. LYMAN, trustee, *vs.* CITY OF BOSTON.

Suffolk.    March 13, 14, 1895. — June 21, 1895.

Present: FIELD, C. J., ALLEN, MORTON, LATHROP, & BARKER, JJ.

*Land taken for Public Improvement — Damages — Evidence — Expert.*

On a petition for a jury to assess damages for the taking of land under a statute
for the purposes of a public park, questions were put by the petitioner, on cross-
examination, to a witness, A., who owned land near to the land in question,
whether there were not restrictions upon his estate, and whether they did not
enter into the price, which questions were excluded.   Subsequently an attorney
testified at length to the state of the title, describing the restrictions, and saying
that he never was fully satisfied as to the title, but that he was content for the
purchaser to take it.   A. testified as to the price which he paid, and the circum-
stances surrounding the sale, and to his conversation with the seller regarding
it.   *Held,* that the petitioner was not prejudiced by the exclusion of the ques-
tions.

On a petition for a jury to assess damages for the taking of land under a statute
for the purposes of a public park, the petitioner has no exception to the exclusion
of a question, on cross-examination, to a witness who owns land near to the
land in question, as to whether there was any topographical resemblance between
his estate and the estate in question.

It is not necessary, in order to qualify a witness as an expert as to value of real
estate, that he should have lived in the locality about which he is testifying, or
should have bought, or sold, or owned land there.   His competency depends
upon other considerations, such as his knowledge of values in the particular
locality, the extent of his experience regarding real estate in the city or town
where the property is situated, and the attention which he has given to the
subject generally.

PETITION for a jury to assess the damages for the taking, by
the Board of Park Commissioners of the city of Boston, for the
purposes of a public park, under the provisions of St. 1875,
c. 185, of a tract of land bordering upon Jamaica Pond, contain-
ing 53,566 square feet, with a dwelling-house and stable thereon.
At the trial in the Superior Court, before *Sherman,* J., the jury
returned a verdict for the petitioner for $18,704; and the peti-
tioner alleged exceptions, in substance as follows.

At the time of the taking, and for more than forty years prior
thereto, the premises had been occupied by Mrs. Susan B. Lyman
as a residence.   In October, 1893, the buildings were torn down,
and material changes made in the condition of the grounds and
shrubberies.

Edward D. Rice, called as a witness by the respondent, testified that he lived in Jamaica Plain, on Pond Street, some distance beyond the corner of Prince; that his house was not in sight on the plan used in the case, neither was it in sight from this place really (indicating on the plan) on the land in question; that he bought the estate in June or on July 1, 1891, having had to wait some time for the deeds, as there were several things that had to be straightened out before they could be made; that it was a portion of an estate that was sold by public auction, some time in May, consisting of about two hundred thousand square feet; that it had upon it a dwelling-house situated in practically the same place as the new house; that there was also a stable on the place, which still remained; and that the new house was smaller than the old, which was a good, fair, old-fashioned house.

Rice testified, on cross-examination, that the depth of the estate from Pond Street was nearly six hundred feet, and that about a third of the land was quite low, and under water at times during the winter. He was then asked if there were restrictions upon building on a considerable part of the land. To this question the respondent's counsel objected, and the judge ruled that the petitioner could not prove the restrictions except by production of the deed. The petitioner then asked the witness whether, when he made his bargain for the land, at the price at which he bought it, he was told, and that entered into the terms of the trade, that there were restrictions upon building between that house and one Bacon's property. To this question the respondent objected, and the judge excluded the question. The petitioner then asked the witness whether or not the price agreed upon between him and the person from whom he bought the property was fixed with reference, among other things, to the restriction of not building on that portion of the land. To this question the respondent objected, and the judge excluded it. The petitioner then asked the witness whether the price for the land which was agreed upon was a price that was fixed irrespective of restrictions upon the property. To this question the respondent objected, and the judge excluded it. The petitioner then asked the witness if there was any view of Jamaica Pond from the land, and he replied that there was not, and that no portion of the estate bordered on the pond. He was then asked

if there was any topographical resemblance, anything in the features of the land in its general aspect, in his land, that was similar to the Lyman property. To this question the respondent objected, and the judge excluded it.

The judge then said that the witness might describe the lot, and the witness testified as follows as to the Lyman and his own estate : " My land contains about five acres, and my house sets in the middle of the lot ; it is about five hundred feet fronting on Pond Street, and it is covered with large old English and American elm trees and other trees, and fruit trees, and, as I said, my house is located there, and my barn over in this corner, partly on my land, and partly on Mr. Billings's land. The house sets on a very, quite sharp, rising ground, over which is a terrace ; and I should say the terrace — I have never measured it — is twenty feet above the driveway ; and then the circular driveway, which you see on the plan here, and this house setting here where these figures are, — the circular drive goes round there, and the land slopes down very rapidly to the street on both sides until it is below the level of the street, so that the property consists of about — well, I should say half of it might be called high land, and half of it might be called low land. The valuable part to me, of course, is where my house sets, and my land back of it. I have n't been to examine the Lyman estate to answer any questions about it, but it is located on Jamaica Pond."

In answer to a question asked by the respondent, the witness replied that he paid for the 212,000 feet of land, including the house and stable, in June, 1891, $20,133.33.

On cross-examination, the petitioner asked the witness whether or not the price which was fixed upon the land between one Billings, the former owner, and himself was fixed with reference to the circumstances of his personal relations to him, and of the object which Billings and the other adjacent owners had in inducing him to come there and buy. The respondent objected to this question, and the judge excluded the same, but permitted the witness to be asked as to what conversation took place between him and Billings.

The witness then testified as to his conversation with Billings, as to the reason why the price was fixed at the sum at which it was fixed ; that walking down town one morning Billings

asked him why he did not buy the estate, and he replied that he could not afford to; that Billings told him that he could afford to, and that he could buy it for $20,000, that is, the "five acres of land and all buildings, the front part of it"; that he agreed to purchase it; that shortly after Billings, who was his personal friend, said in conversation, " Well, I do not know as you are going to get that land after all," and that he replied, " Why not? I thought you sold it to me," and Billings answered that several gentlemen had bought this whole property with him, and that he was appointed to furnish the money and carry out the trade with the aid of a lawyer; that he found that one of these gentlemen had promised to give a friend of his an opportunity to buy the property, and that, if he did not take it, he, Rice, would have an opportunity; that shortly after Billings told him that the person referred to was not going to buy, and he, Rice, could have the estate, " and finally, to make a long story short, he agreed to buy back — to deliver what he sold me, and then buy back — a certain portion of the land, a strip of land, give me a lease of the barn, two thirds of which now belongs to him, and is on his land, and the other is on my land"; that the land upon which two thirds of the barn was situated he had a lease of for ten years; that the strip of land which he got was a strip running from the back of the land to Pond Street; and that when he had fixed the price testified to he had taken into account selling Billings the strip about twenty feet in width and six hundred feet in length.

The witness further testified that he was present at the auction sale, and that the property was bid off to the parties interested by Mr. Welch, their attorney.

Before the judge passed upon this evidence it appeared that, when the jury viewed the premises, the counsel for the petitioner and respondent being present, the jury also viewed the land which was sold to Rice. The petitioner then renewed his objections to the admissibility of the sale, but the judge said, the jury having viewed the land, he still thought the evidence was competent.

Subsequently Mr. Francis V. Balch, called by the respondent, testified at length, without objection, to the state of the title, describing the restrictions, and saying in substance that he never

was fully satisfied as to the nature of them, that he did not regard the title as absolutely clear, but that he was content for Rice to take the title, and he, Balch, passed it.

At the conclusion of Mr. Balch's evidence, the petitioner renewed his objection to the admission of the sale to Rice, and moved that the testimony be stricken out; but the judge declined to grant the motion.

The respondent called as experts James M. Meredith, Frederick H. Viaux, Albert R. Whittier, and John C. Cobb. The petitioner objected that the witnesses were not qualified, and he excepted to rulings permitting them to testify. All of them except Cobb testified that they were real estate brokers doing business in Boston, and all of them except Whittier, that they were members of the Real Estate Exchange in Boston. Meredith, Viaux, and Whittier testified that they had followed the prices, and kept acquainted with the value of real estate in the city and suburbs, including Jamaica Plain. Cobb said that on several occasions he had appraised land at Jamaica Plain, and had made investigations for that purpose; that he was familiar with sales of land and values there, and he was engaged in the management, care, and development of real estate in Boston, in South Boston, and in the suburbs. All of them testified that they had examined the premises in question before the trial, though after the buildings had been removed. Meredith also said that he had advised people as to sales of land in Jamaica Plain. Viaux said that he was acquainted generally with the streets and buildings in Jamaica Plain and property around the pond. Whittier stated that he had testified as an expert to values of real estate there; that he had known of sales there, and had known of the real estate in controversy for many years. Cobb also said that he was familiar with it.

It appeared that none of them had ever lived in Jamaica Plain, and that, with the exception of Meredith, — and in his case it was several years before the taking in question, — they had not bought, or sold, or owned land there.

*R. M. Morse*, (*J. Duff* with him,) for the petitioner.

*T. M. Babson*, for the respondent.

MORTON, J. 1. The questions put by the petitioner to the witness Rice, on cross-examination, whether there were not re-

strictions upon his estate, and whether they did not enter into
the price, were excluded, on the ground that the restrictions
could only be shown by the production of the deed. Subse-
quently Mr. Balch testified at length, without objection, to the
state of the title, describing the restrictions, and saying in sub-
stance that he never was fully satisfied as to the nature of them,
that he did not regard the title as absolutely clear, and that he
was content for Rice to take it, and passed it. Rice gave the
price which he paid for the property, and testified to the cir-
cumstances surrounding the sale, and to his conversations with
Billings regarding it. The facts explanatory of the title and
the sale were all before the jury, and they could judge whether
the restrictions were accounted material, and affected the price.
It does not seem to us that the petitioner was prejudiced by the
exclusion of the questions. It was much better to have the wit-
ness describe the two estates than to permit him to express his
opinion on their topographical similarity. The petitioner has
no valid exception to the exclusion of the question to Rice,
whether there was any topographical resemblance between his
estate and the Lyman estate.

2. The next exception is that the Rice estate was so dissimilar
to the Lyman estate that the price paid for the former furnished
no just guide to the value of the latter. The dissimilarity is al-
leged to consist of the restrictions upon the Rice estate, and in
the size, shape, topographical features, and situation of the two
estates. It is also said that the sum paid for the Rice estate did
not tend to show its market value, but involved other matters be-
sides the value of the land and buildings, and included buildings
of whose value the jury had no means of judging. It is well set-
tled that sales of land similarly situated, and not too remote in
point of time, are admissible to determine the value of land taken
for public purposes. From the nature of the case no two estates
can be exactly alike. The question in each case is whether the
similarity is sufficient to afford material assistance to the jury in
determining the value of the estate in controversy, or whether
the dissimilarity is such that the jury will be liable to be misled
and prejudiced by the evidence. It is evident that there may be
considerable difference in the size, shape, situation, use, and im-
mediate surroundings of two estates, and perhaps in other re-

spects, and yet the price which one brought may be of substantial assistance in determining the value of the other.   There may be general considerations applicable to both alike which largely affect their value, and render it proper that the price paid for one should be considered in arriving at the value of the other, notwithstanding the differences between them.   *Benham* v. *Dunbar*, 103 Mass. 365.   Much must of necessity be left to the discretion of the presiding judge on the question whether the similarity is such as to render the testimony competent.   But his discretion is not an unlimited one.   *Chandler* v. *Jamaica Pond Aqueduct,* 122 Mass. 305.   If in the present case he had excluded the evidence because the two estates were not sufficiently alike, we should have hesitated to disturb the ruling. On the other hand, we cannot say that the restrictions were of such a character, or the dissimilarity of the two estates so great, that the evidence would tend to mislead or prejudice the jury, and would be of no material assistance to them in arriving at the value of the land in controversy, and that its admission was clearly wrong.   The facts in regard to the sale and explanatory of it were, as already observed, all before the jury, and they could consider what effect, if any, they naturally would have had on the price, and how far that represented the actual market value.   The fact that it included buildings could also be taken into account by them.   *Patch* v. *Boston*, 146 Mass. 52, 57.

3. The remaining exception relates to the competency of the four experts called by the city, — Meredith, Viaux, Whittier, and Cobb.   The petitioner objected that they were not qualified, and excepted to rulings permitting them to testify.   All of them except Cobb testified that they were real estate brokers doing business in Boston, and all of them except Whittier that they were members of the Real Estate Exchange in Boston. Perhaps Whittier was a member also, though it did not appear. Meredith, Viaux, and Whittier stated that they had followed the prices and kept themselves acquainted with the values of real estate in the city and suburbs, including Jamaica Plain.

Cobb stated that on several occasions he had appraised lands at Jamaica Plain, and had made investigations for that purpose, and that he was familiar with sales of land and values there, and that he was engaged in the management, care, and develop-

ment of real estate in Boston, in South Boston, and in the suburbs. All of them testified that they had examined the premises in question before the trial, though after the buildings had been removed. Meredith also stated that he had advised people as to sales of land in Jamaica Plain. Viaux said that he was acquainted generally with the streets and buildings in Jamaica Plain and property around the pond. Whittier stated that he had testified as an expert to values of real estate there, that he had known of sales there, and had known the real estate in controversy for many years. Cobb also stated that he was familiar with it. We think that the rulings admitting them to testify as experts were correct. It is true that it appears that none of them had ever lived in Jamaica Plain, and that, with the exception of Meredith, and in his case it was several years before the taking in question, they had not bought or sold or owned land there. But it is not necessary in order to qualify a witness as an expert as to values of real estate that he should have lived in the locality about which he is testifying, or should have bought or sold or owned land there. If he has done that, it may give additional value to his opinion; but the fact that he has not done it does not destroy his competency as an expert. That depends on other considerations, such as his knowledge of values in the particular locality, the extent of his experience regarding real estate in the city or town where the property is situated, and the attention which he has given to the subject generally. *Bristol County Savings Bank* v. *Keavy*, 128 Mass. 298. It is possible that districts might be so widely separated in a metropolitan area that the general knowledge which a real estate broker might have of values would not be regarded as a sufficient qualification in regard to a particular neighborhood. We do not, however, think that that is true of Boston and Jamaica Plain. See *Amory* v. *Melrose*, 162 Mass. 556.

On the whole, we discover no error in the rulings.

*Exceptions overruled.*